UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

| | | |
|---|---|---|
| TRUDY R. EARNEST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:16 CV 61 CDP |
| | ) | |
| NANCY A. BERRYHILL, Acting | ) | |
| Commissioner of Social Security,[1] | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

Plaintiff Trudy R. Earnest brings this action under 42 U.S.C. § 1383(c)(3)

seeking judicial review of the Commissioner's final decision denying her

application for supplemental security income (SSI) under Title XVI of the Social

Security Act, 42 U.S.C. §§ 1381, *et seq.* Because the Commissioner failed to

consider the entirety of the record in determining Earnest's residual functional

capacity (RFC), I will reverse the decision and remand for further proceedings.

### Procedural History

Earnest filed her application for SSI in April 2013, claiming that she became

disabled on July 1, 2007, because of fibromyalgia, allodynia, hyperalgesia, chronic

pain, sacroiliac joint pain, sciatica pain and spasms, degenerative disc disease,

---

[1] Nancy A. Berryhill became the Acting Commissioner of Social Security on January 20, 2017.
She is therefore automatically substituted for former Acting Commissioner Carolyn W. Colvin as

arthritis, high RH factor, severe musculoskeletal pain, tingling and numbness in feet, shooting pain down legs, and chronic pain in joints. (Tr. 185-95, 209.) Earnest later amended her alleged onset date to March 12, 2013. (Tr. 34.)[2] On August 6, 2013, the Social Security Administration denied Earnest's claim for benefits. (Tr. 68-115.) Upon Earnest's request, a hearing was held before an administrative law judge (ALJ) on April 29, 2015, at which Earnest and a vocational expert testified. (Tr. 31-67.) The ALJ issued a written decision on June 5, 2015, denying Earnest's claim for benefits, finding that she could perform work as it exists in significant numbers in the national economy. (Tr. 17-26.) On August 2, 2016, upon review of additional evidence, the Appeals Council denied Earnest's request for review of the ALJ's decision. (Tr. 1-5.) The ALJ's determination thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

In this action for judicial review, Earnest contends that the ALJ's decision is not supported by substantial evidence on the record as a whole. Specifically, Earnest argues that the ALJ erred by discounting the opinion of her treating nurse practitioner and failed to adequately consider her impairment of fibromyalgia when

---

the defendant in this action. Fed. R. Civ. P. 25(d).

[2] Earnest also filed an application for disability insurance benefits under Title II of the Act (Tr. 178-84) but, upon amending the alleged onset date of disability, she pursued only her application for SSI. (Tr. 34.)

assessing her RFC.  Earnest requests that the matter be remanded to the Commissioner for further consideration.  For the reasons that follow, I will reverse the decision and remand for further proceedings.

**Evidence Before the ALJ**

A.    <u>Testimonial Evidence</u>

    1.    *Earnest's Testimony*

At the hearing on April 29, 2015, Earnest testified in response to questions posed by the ALJ and counsel.

At the time of the hearing, Earnest was forty-four years old.  She went to school through the eleventh grade and later obtained her GED.  She also trained and was certified as a certified nurse's assistant.  Earnest lives in a house with her husband and two sons, who are ten and eight years old.  She stands five feet, seven inches tall and weighs 200 pounds.  (Tr. 36-38, 54.)

Earnest's Work History Report shows that she worked as a line worker from 1992 to 1995.  From 1996 to 1998, she worked as a caretaker.  Earnest worked at Hannibal Regional Hospital from 1998 to 1999 in phlebotomy.  She worked in customer service from 1999 to 2004.  (Tr. 244.)  Earnest testified that she stopped working in 2007 after her son was born with spina bifida.  She testified that the stress brought on by that circumstance caused many mental, physical, and emotional problems, and she could not go back to work.  (Tr. 42-43.)

Earnest testified that she has been diagnosed with fibromyalgia and that the condition affects her entire body. She experiences stiffness, tingling and numbness in her hands and feet, achiness in her legs and feet, and a lot of pelvic pressure. (Tr. 45-47.) Burning and stabbing pain in her joints and sacroiliac area shoots down her legs and into her feet. (Tr. 39-40.) Earnest testified that she elevates her legs and performs certain exercises to try to alleviate the pain. She also alternates applying ice packs and heat throughout the day, and she sleeps on an ice pack at night. (Tr. 47-49.) She takes hydrocodone every four to six hours for pain and uses a TENS unit three or four times a day. (Tr. 44, 49-50.)

Earnest testified that her fibromyalgia pain is more severe in areas where she suffered fractures from an earlier automobile accident – her left wrist, right shoulder, left ankle, and some ribs. She hardly uses her left hand because of significant pain; and her neck, shoulder, and ankle constantly pop and ache. Earnest also had cervical spine surgery in 2002 and had a plate and four screws placed in her neck. She experiences stiffness and pain in the neck area because of arthritis and has difficulty sleeping because of the condition. (Tr. 40-42.)

Earnest testified that she experiences migraine headaches three to four times a week. They last over three hours and she sometimes experiences nausea and vomiting with the headaches. For these headaches, Earnest takes pain medication and lies down on ice packs in a dark room. She also uses her TENS unit. Earnest

also has tension headaches two to three times a week. (Tr. 43-45.)

Earnest has also been diagnosed with depression and takes medication for the condition. Earnest testified that an abusive childhood is the source of her depression. (Tr. 53-54.)

In addition to hydrocodone, Earnest takes ibuprofen, Aleve, Savella, Prozac, and lorazepam for her impairments. (Tr. 51-52.) Her medication helps the pain for short periods, but her pain is chronic. (Tr. 58.) Earnest testified that she has many side effects from her medication, including irritable bowel syndrome, constipation, profuse sweating, anxiety, dry mouth, dry skin, and "brain fog." (Tr. 53.)

As to her exertional abilities, Earnest testified that she can stand for about fifteen minutes before she experiences pain. (Tr. 39.) Sitting in a straight-back chair causes pain. Earnest testified that she does not sit a lot because of pain. (Tr. 48.)[3] Lying flat on her back is most comfortable for her. (Tr. 51.) Earnest can lift two or three pounds, but she tries not to lift anything because of her neck condition. (Tr. 55.) Earnest testified that she experiences pain and gets dizzy and lightheaded if she bends, squats, or stoops. (Tr. 57.)

As to her daily activities, Earnest testified that she goes to bed around 8:30 p.m. and wakes up every three hours because of pain. She gets up in the morning at 6:00 a.m. Her children dress and feed themselves before school. Earnest

---

[3] It was noted that Earnest stood up on various occasions during the hearing. (Tr. 48.)

testified that she spends most of her day resting in bed. (Tr. 50-51.) Her husband does a lot of the housework and takes care of the lawn. She has an adult daughter and an aunt who help care for the children. (Tr. 38-39.) Earnest can drive but does so only when she has to and then only for short distances. For longer distances, she makes arrangements with a transportation service. She shops with her husband. Earnest has difficulty with some personal care, such as shaving her legs and brushing her hair. She bathes three or four times a week, and her husband sometimes helps her. (Tr. 55-57.)

2.    *Vocational Expert Testimony*

Ira Watts, a vocational expert, testified at the hearing in response to questions posed by the ALJ and counsel.

Mr. Watts characterized Earnest's past work as a customer service clerk as semi-skilled and light, and as a home health aide as semi-skilled and medium. The ALJ asked Mr. Watts to consider a person the same age, education, and past work as Earnest and to assume the person was limited

> to lifting no more than 20 pounds occasionally, 10 pounds frequently. Sit, stand, or walk six hours in an eight-hour day. No climbing ropes, ladders, scaffolding. Only occasional climbing ramps, stairs, balance, stoop, kneel, crouch, crawl. Occasional reaching or working overhead. Occasional operation of pedals or foot controls. The work would need to be simple, repetitive and routine. Only occasional contact with coworkers and supervisors or the general public.

(Tr. 59.) Mr. Watts testified that such a person could not perform Earnest's past

relevant work but could perform other work, such as light and unskilled work as an order caller, router, and inspector.  (Tr. 59-60.)

The ALJ then asked Mr. Watts to assume the same individual but that she was limited to lifting ten pounds occasionally and less than ten pounds frequently, and could stand or walk only two hours in an eight-hour workday.  Mr. Watts testified that such a person could perform sedentary, unskilled work as a bonder/semi-conductor, service waiter, or dowel inspector.  (Tr. 61-62.)

The ALJ then asked Mr. Watts to assume the person from the second hypothetical to require a sit/stand option at work with a need to change position every ten to twenty minutes.  Mr. Watts testified that such a person could continue to perform work as a bonder/semi-conductor and dowel tester as well as work as a wait tester and final assembler.  (Tr. 63-64, 66.)  Mr. Watts further testified that if this person missed work more than three or four days each month, or was off task at least twenty percent of the time, she would not be employable.  (Tr. 64-65.)

In response to counsel's questions regarding the jobs identified, Mr. Watts testified that work as a bonder/semi-conductor requires occasional use of the hands and that all other work requires frequent use of the hands.   (Tr. 65-66.)

B.    Medical Evidence

On August 1, 2008, Earnest visited her treating physician, Dr. David J. Knorr, seeking treatment for poison ivy.  Routine examination showed tenderness

and some thickening of the synovium of the wrists.  (Tr. 312.)

Earnest visited Dr. Imelda P. Cabalar, a rheumatologist, on October 28, 2008, with complaints of pain in her shoulders, hips, and left wrist.  She reported her pain to be at a level eight out of ten and that it was worse in the morning but improves with activity.  She also reported that swelling and morning stiffness in the right shoulder last more than an hour.  Dr. Cabalar noted that recent laboratory tests were positive for rheumatoid factor.  Physical examination showed full range of motion about the shoulders, elbows, hips, knees, ankles, cervical spine, and right wrist with no tenderness or effusion.  Tenderness and decreased range of motion was noted about the left wrist.  No tenderness was noted about the lumbosacral spine.  There was no evidence of any inflammatory arthritis.  Dr. Cabalar suspected degenerative joint disease and prescribed Etodolac for pain.  (Tr. 353-55.)

Earnest visited the Hannibal Free Clinic (the "Clinic") on January 15, 2009, and complained of pain in her right hip and low back.  The pain was worse at night.  Examination showed decreased deep tendon reflexes about the ankles. Straight leg raising was negative.  Earnest had normal range of motion about the hips and back.  Earnest was diagnosed with chronic right gluteal pain, and Flexeril and naproxen were prescribed.  (Tr. 392-93.)

Earnest returned to the Clinic on March 19 and complained of continued

back pain.  Earnest reported that steroids, Naprosyn, Mobic, and ibuprofen prescribed by Dr. Knorr did not help her pain, but that chiropractic treatment did. Examination showed decreased range of motion about the lumbosacral spine with side bending.  Straight leg raising was negative.  No neurological defects were noted.  Earnest was diagnosed with sacroiliitis, and Voltaren was prescribed. Earnest was also instructed to undergo osteopathic manipulation.  (Tr. 389-90.)  On May 14, Earnest reported that manipulation helped for about three weeks and that pain medication was not necessary during that time.  She reported that she experienced pain again when she started walking on the treadmill and had to restart her pain medication.  Examination showed muscle spasm at the L5-S1 level with trigger points over the right posterior superior iliac spine.  Earnest was diagnosed with somatic dysfunction and was prescribed Flexeril and Ultram.  She was instructed to undergo additional osteopathic manipulation.  (Tr. 386-87.)

Earnest visited Dr. Knorr on December 3, 2009, with complaints of deep, aching pain in both thighs and a lot of pain in the right hip and sacroiliac joint. Earnest also had the same deep, aching pain in her shoulders.  Examination showed tenderness in the low back at the right SI joint, radiating down the gluteus medius and into the thigh.  Dr. Knorr ordered an MRI of the right hip.  Dr. Knorr considered treatment for fibromyalgia given the nature of Earnest's pain.  (Tr. 313.)  X-rays of the right shoulder, hip, SI joint, and lumbar spine showed no acute

abnormality and were essentially normal.  Mild osteoarthritis in the shoulder was noted as well as minimal endplate osteophyte formation in the lumbar spine.  (Tr. 314-17.)

Earnest returned to Dr. Knorr on November 2, 2010, with complaints of diffuse pain in the back around the SI joints and in the paraspinal region.  Tender points were noted in the trapezius muscles, the rhomboids, the pectoral muscles, and the inner parts of her knees.  Dr. Knorr considered this to be consistent with fibromyalgia.  Dr. Knorr also noted that Earnest was stressed and feeling overwhelmed.  He diagnosed Earnest with likely fibromyalgia, obesity, and anxiety from increased stress.  Dr. Knorr gave Earnest a Toradol injection for pain and some samples of Lyrica.  He prescribed Ativan for anxiety.  (Tr. 318.)

Earnest visited the Clinic on March 30, 2011, and complained of right hip pain radiating to the groin area.  She was diagnosed with SI joint pain and sacroiliitis.  (Tr. 382.)

Earnest was involved in a motor vehicle accident in April 2011and experienced headaches, neck pain, and hip pain as a result.  She was given tramadol and Skelaxin at the hospital, which reduced her pain.  She was diagnosed with cervical strain and right hip contusion and discharged that same date.  Upon discharge, Earnest was prescribed Skelaxin, Naprosyn, and Ultram.  (Tr. 325, 330-32, 336.)

On July 18, 2011, Earnest visited Dr. R. Draper at the Clinic and complained that her joint and muscle pain had increased and was now at a level ten. Earnest was diagnosed with fibromyalgia and was prescribed Ultram and Cipro. (Tr. 380.) On August 29, Earnest reported that her pain was a little better but she was having trouble sleeping. Her current medications were noted to include Aleve, Neurontin, and Ultram. Dr. Draper diagnosed Earnest with insomnia and chronic pain. Xanax was prescribed. (Tr. 377-78.)

Earnest returned to Dr. Draper on November 9 and reported that Neurontin no longer helped and that she felt more depressed with Xanax. Earnest continued in her diagnoses of chronic pain and fibromyalgia. Baclofen and lorazepam were prescribed. (Tr. 376.) On December 7, Earnest reported to Dr. Draper that she had restarted Neurontin but had pain in her lower back and right hip, and stabbing pain in her right shoulder. Dr. Draper noted that she was agitated. Lyrica and Ultram were prescribed for pain. (Tr. 374.)

Earnest returned to Dr. Draper on March 5, 2012, and requested a prescription for Savella for pain and asked that her dosage of lorazepam be increased. Dr. Draper diagnosed Earnest with fibromyalgia and depression and prescribed Savella, Soma, and Ativan. (Tr. 372.) On May 7, Earnest reported that she was stiff and experienced shoulder pain with movement. She reported that she could not relax and that her mind races. Dr. Draper diagnosed Earnest with

anxiety, insomnia, chronic pain, and muscle spasms and instructed her to increase her Soma and lorazepam. (Tr. 370.) On October 4, Earnest was prescribed Lortab and Cipro in response to continued complaints of low back pain, shoulder pain, and joint pain. (Tr. 368.)

Earnest visited Dr. Lynn Walley on March 21, 2013, for her annual well-woman examination. Earnest reported having generalized pain since her last C-section in 2007, with particularized pain in her hips. She reported that pain medication provided no relief and that the hydrocodone she takes causes constipation. Dr. Walley diagnosed Earnest with moodiness and generalized joint and muscle pains. She prescribed fluoxetine and suppositories with hydrocortisone. (Tr. 357-59.)

Earnest returned to the Clinic on April 4, 2013, for chronic pain management. It was noted that she had applied for disability. Earnest was instructed to continue with her medications, which included Soma, Lortab, lisinopril, Prozac, and lorazepam. (Tr. 365.)

On June 10, 2013, Earnest underwent a consultative psychological evaluation for disability determinations. Thomas J. Spencer, Psy.D., noted Earnest's chief complaint to be chronic pain associated with fibromyalgia. Earnest reported the pain to be worsening and that she experiences pain to the touch. Earnest reported that she is depressed and cannot think straight because of the pain.

She reported that her pain medication causes bad side effects but she cannot function without the medication. She reported her pain to be a level seven on an average day. She is able to function independently if she takes her medication. She is fatigued because of interrupted sleep and is very forgetful. She lacks motivation. She reported feeling hopeless and helpless. She also reported having crying spells, being moody, and that she was chronically worried. Earnest reported that she and her eldest daughter were each abused when they were children and that she had been treated for depression because of it. (Tr. 405-08.)

Mental status examination showed Earnest to be in mild to moderate physical distress. Eye contact was intermittent and her speech was flat. Dr. Spencer noted Earnest to shift frequently in her chair, as if in a lot of pain. Her insight and judgment were fairly intact. She was alert and oriented times four. Her flow of thought was intact and relevant. Her affect was dysphoric. Dr. Spencer determined Earnest to be of low average to average intelligence. She appeared to have no memory impairment. Dr. Spencer diagnosed Earnest with major depressive disorder, recurrent, moderate to severe; and anxiety disorder. Generalized anxiety disorder and pain disorder were to be ruled out. Dr. Spencer assigned a GAF score of 50 to 55. Dr. Spencer opined that Earnest retained the ability to understand and remember simple instructions and to engage in and persist with simple tasks. He further opined that Earnest was moderately to

markedly impaired in her ability to interact socially and in her ability to adapt to change in the workplace.  (Tr. 405-08.)

On June 29, Earnest underwent a consultative physical examination for disability determinations.  The overall examination was unremarkable and showed no deficits.  Earnest had full range of motion and showed no evidence of swelling, crepitus, erythema, or joint effusion.  She was able to walk on her heels and toes, could bend over and touch her toes, and was able to squat and rise from that position.  She could raise her arms above her head.  Her hands and fingers appeared normal.  She had full grip strength bilaterally.  Reflexes were normal. Dr. Dennis A. Velez reported that no documentation or findings from his clinical examination supported Earnest's allegations of pain, spasms, tingling, or numbness.  He noted Earnest not to have any tenderness to palpation in any joints and no limitation on range of motion.  He further noted her to have normal strength, normal sensation, preserved reflexes, and no radicular symptoms.  He opined that Earnest had no "limitations as far as sitting, standing or walking.  She does not have any manipulative limitations.  She should be able to use her hands for writing, using small tools among other things.  She does not have any lifting or carrying limitations."  (Tr. 411-14, 417-18.)

Earnest visited the Clinic on September 5, 2013, for an adjustment to her medications.  (Tr. 477.)

On September 12, Earnest visited the Hannibal Regional Medical Group (the "Medical Group") and complained of a recent onset of foot pain. Her current medications were noted to include fluoxetine, hydrocodone, and lorazepam. Earnest complained of general fatigue and body aches but denied any headache. She was in mild distress. Trace edema and tenderness was noted about the right foot at the base of her toes. Earnest was prescribed ibuprofen for pain and swelling. (Tr. 426-29.) She returned on November 30 with complaints of symptoms associated with urinary tract infection. She also complained of low back pain, shoulder pain, and muscle pain associated with fibromyalgia. Earnest was instructed to follow up with her primary care provider regarding her fibromyalgia pain. (Tr. 430-32.)

Earnest visited the Clinic on March 6, 2014, for follow up of chronic pain in the low back, joints, and neck, as well as for headaches with fever. Earnest was diagnosed with fibromyalgia, hypertension, chronic pain, cervical disc disease, and anxiety. Her prescribed medications included lorazepam, Norco, Soma, and Cipro. (Tr. 475.)

Earnest visited the Medical Group on May 22 for a general physical examination. She reported having chronic stabbing pain in her neck, shoulders, hips, and sacroiliac joints. She also reported recent onset of headaches. It was noted that she sleeps an average of four hours per night. Earnest's current

medications included lorazepam, fluoxetine, hydrocodone, Soma, and Savella. Earnest was diagnosed with degenerative disc disease and fibromyalgia. (Tr. 433-34.)

Earnest returned to the Clinic on September 4, 2014, for her six-month recheck and reported that she experiences pain at a level ten when she sits, stands, or walks. Earnest's prescription for Norco was adjusted. (Tr. 474.)

On October 14, 2014, Earnest visited family nurse practitioner Deanna Davenport at the Rheumatology Clinic at MU Health Care for consultation upon referral by Dr. Jeffrey Wells. Earnest reported her relevant medical history, including that she had a positive rheumatoid factor years ago but was never treated for rheumatoid arthritis. Earnest reported that she experienced widespread musculoskeletal pain on a daily basis in her muscles and in her joints. She reported the pain to worsen with physical activity and with weather changes. She reported that a TENS unit and hot and cold packs help somewhat. Earnest also reported having sudden, severe headaches and active anxiety and depression. Physical examination showed Earnest to have diffuse tenderness to touch, but movement of the joints did not increase pain and she had normal range of motion. FNP Davenport noted Earnest to have 18/18 fibromyalgia trigger points. Lumbar flexion was limited by pain. No focal or motor weakness was noted. FNP Davenport noted recent lab tests to show slightly elevated rheumatoid factor. X-

rays of the hands showed no evidence of inflammatory arthritis, but posttraumatic deformity of the left distal radius was noted. FNP Davenport opined that Earnest did not have rheumatoid arthritis but "definitely" had chronic pain and fibromyalgia. FNP Davenport opined that the chronic pain was a combination of chronic spinal pain from degenerative disc disease and fibromyalgia. FNP Davenport considered Earnest's medications to be "decent," and she recommended that Earnest follow up regularly with a spinal doctor, engage in mild regular exercise, get some sound sleep, and treat her depression. (Tr. 448-51.)

Earnest returned to the Hannibal Free Clinic on December 4, 2014, for follow up. She complained of headaches, which the Clinic considered to be tension headaches. Earnest was continued on her medications. (Tr. 460.)

In a letter dated January 15, 2015, FNP Davenport described her examination of Earnest in October 2014. She reported the examination to show no evidence of any joint swelling or deformity consistent with rheumatoid arthritis, but that Earnest had "widespread tenderness to touch and chronic pain consistent with fibromyalgia. I believe her fibromyalgia arose out of her chronic low back pain and disc disease. She is on appropriate therapy for this, but continues with quite a bit of daily pain and fatigue." (Tr. 453.)

Earnest returned to the Clinic on March 5 and was continued on her medications. Protonix was added for gastrointestinal esophageal reflux. (Tr. 457.)

On March 25, FNP Davenport completed a Mental Medical Source Statement (MMSS) wherein she opined that Earnest had moderate limitations in her ability to carry out simple instructions, understand and remember complex instructions, carry out complex instructions, and make judgments on complex work-related decisions. She further opined that Earnest had mild limitations in her ability to make judgments on simple work-related decisions, and no limitations in her ability to understand and remember simple instructions. FNP Davenport explained that Earnest's chronic fatigue and pain cause distraction, which limits her ability to focus and concentrate and thereby adversely affects her ability to remember instructions and make complex decisions. FNP Davenport further opined that Earnest was moderately limited in her ability to respond appropriately to usual work situations and to changes in a routine work setting and was mildly limited in her ability to interact appropriately with the public, supervisors, and co-workers. FNP Davenport explained that stress increases Earnest's pain, which would worsen with changes in situations. FNP Davenport also reported that any physical activity – and particularly repetitive motion – increases Earnest's pain. She reported that diffuse tenderness to touch and mild muscle deconditioning supported her assessment of Earnest's pain. FNP Davenport further opined that Earnest would need a break to rest or change position every fifteen to twenty minutes for at least ten minutes and, further, that Earnest would miss work at least

four days a month and would be off task at least twenty-five percent of the time while at work.  (Tr. 486-90.)

### Additional Evidence Considered by the Appeals Council

The Appeals Council considered additional medical records in its determination to deny Earnest's request for review.  I must consider this additional evidence in determining whether the ALJ's decision is supported by substantial evidence.  *Frankl v. Shalala*, 47 F.3d 935, 939 (8th Cir. 1995); *Richmond v. Shalala*, 23 F.3d 1441, 1444 (8th Cir. 1994).

In conjunction with Earnest's examination at the Medical Group on May 22, 2014, a separate disability evaluation was completed wherein it was noted that examination showed Earnest to have decreased range of motion, decreased strength, and joint pain with fibromyalgia.  Earnest was diagnosed with traumatic arthritis as well as anxiety and depression.  (Tr. 495-96.)

Earnest visited the Medical Group on April 14, 2015, for symptoms associated with an ear infection.  (Tr. 497-500.)  Earnest returned on May 22 with complaints of dental pain associated with a dental infection.  (Tr. 501-04.)  Earnest continued to have mouth pain on June 23.  (Tr. 505-07.)  Earnest visited the Clinic on July 2 for follow up of the gum infection.  She was continued on her treatment regimen for all of her impairments.  (Tr. 509.)

## The ALJ's Decision

The ALJ found that Earnest met the insured status requirements of the Social Security Act through September 30, 2011.  The ALJ found that Earnest had not engaged in substantial gainful activity since July 1, 2007.  The ALJ found Earnest's fibromyalgia, degenerative disc disease with cervical fusion, obesity, diagnosis of neuropathy, depression, and anxiety to be severe impairments but that she did not have an impairment or combination of impairments that met or medically equaled an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1.  (Tr. 19-20.)

The ALJ found Earnest to have the RFC to perform light work, except that she could

> lift and/or carry 20 pounds occasionally and 10 pounds frequently; sit 6 hours in an 8-hour day; and stand and/or walk 6 hours in an 8-hour day.  The claimant is unable to climb ladders.  [She] can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. [She] can occasionally reach overhead and occasionally operate foot pedal controls.  The claimant is limited to simple, routine, and repetitive work and occasional contact with supervisors, co-workers, and the general public.

(Tr. 21.)  The ALJ found Earnest unable to perform any of her past relevant work. Considering Earnest's age, education, work experience, and RFC, the ALJ found vocational expert testimony to support a finding that Earnest could perform other work as it exists in significant numbers in the national economy, and specifically, order caller, router, and inspector.  The ALJ thus found Earnest not to be under a

disability from July 1, 2007, through the date of the decision.  (Tr. 24-26.)

## Discussion

To be eligible for SSI under the Social Security Act, Earnest must prove that she is disabled.  *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *Baker v. Secretary of Health & Human Servs.,* 955 F.2d 552, 555 (8th Cir. 1992).  The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(A).  An individual will be declared disabled "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process.  *See* 20 C.F.R. § 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).  The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity.  If the claimant is working, disability benefits are denied.  Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which

significantly limits her ability to do basic work activities.  If the claimant's

impairment(s) is not severe, then she is not disabled.  The Commissioner then

determines whether claimant's impairment(s) meets or equals one of the

impairments listed in 20 C.F.R., Subpart P, Appendix 1.  If claimant's

impairment(s) is equivalent to one of the listed impairments, she is conclusively

disabled.  At the fourth step, the Commissioner establishes whether the claimant

can perform her past relevant work.  If so, the claimant is not disabled.  Finally, the

Commissioner evaluates various factors to determine whether the claimant is

capable of performing any other work in the economy.  If not, the claimant is

declared disabled and becomes entitled to disability benefits.

       I must affirm the Commissioner's decision if it is supported by substantial

evidence on the record as a whole.  42 U.S.C. § 405(g); *Richardson v. Perales*, 402

U.S. 389, 401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002).

Substantial evidence is less than a preponderance but enough that a reasonable

person would find it adequate to support the conclusion.  *Johnson v. Apfel*, 240

F.3d 1145, 1147 (8th Cir. 2001).  Determining whether there is substantial

evidence requires scrutinizing analysis.  *Coleman v. Astrue*, 498 F.3d 767, 770 (8th

Cir. 2007).

       To determine whether the Commissioner's decision is supported by

substantial evidence on the record as a whole, I must review the entire

administrative record and consider:

1. The credibility findings made by the ALJ.

2. The plaintiff's vocational factors.

3. The medical evidence from treating and consulting physicians.

4. The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5. Any corroboration by third parties of the plaintiff's impairments.

6. The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

*Stewart v. Secretary of Health & Human Servs.*, 957 F.2d 581, 585-86 (8th Cir. 1992) (internal citations omitted).  I must consider evidence which supports the Commissioner's decision as well as any evidence that fairly detracts from the decision.  *McNamara v. Astrue*, 590 F.3d 607, 610 (8th Cir. 2010).  If, after reviewing the entire record, it is possible to draw two inconsistent positions and the Commissioner has adopted one of those positions, I must affirm the Commissioner's decision.  *Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir. 2012).  I may not reverse the Commissioner's decision merely because substantial evidence could also support a contrary outcome.  *McNamara*, 590 F.3d at 610.

As noted above, Earnest challenges the ALJ's treatment of FNP Davenport's opinion as well as the extent to which the ALJ considered her impairment of

fibromyalgia when assessing her RFC.  While the ALJ accorded proper treatment to FNP Davenport's opinion evidence, I find that he failed to adequately consider the medical evidence of record relating to Earnest's diagnosed impairment of fibromyalgia and chronic pain.  I will therefore remand the matter for further consideration.

A.    Weight Given to FNP Davenport's Opinion Evidence

The ALJ gave no weight to the March 2015 MMSS completed by FNP Davenport, finding that it was 1) procured by Earnest's counsel, 2) outside the area of the FNP's expertise, and 3) not rendered by an acceptable medical source under the Regulations.  Because the ALJ provided sufficient reasons to disregard the opinions expressed in this MMSS, and his reasons are supported by substantial evidence on the record, he did not err.

"Medical opinions are statements from . . . acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairments, including [their] symptoms, diagnosis and prognosis, what [they] can still do despite impairment(s), and [their] physical or mental restrictions."  20 C.F.R. § 416.927(a)(2).  Nurse practitioners are not "acceptable medical sources" and cannot give medical opinions.  20 C.F.R. § 416.913(d)(1); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).  While the Regulations permit an ALJ to consider evidence from these sources to show the severity of a claimant's impairment(s) and

how it affects the claimant's ability to work, *see* 20 C.F.R. § 416.913(d), the factors for weighing medical opinion evidence do not explicitly apply.[4]  SSR 06-03p, 2006 WL 2329939, at *4-5.  Accordingly, the ALJ did not err in considering the fact that FNP Davenport was not an acceptable medical source in determining not to accord any weight to her opinion evidence.

Further, the ALJ noted that FNP Davenport rendered an opinion on Earnest's *mental* ability to perform work-related functions when Davenport herself is a nurse practitioner in rheumatology.  Because Davenport is not a mental health specialist, her opinion regarding the vocational implications of Earnest's mental limitations is entitled to no weight.  *Keeling v. Colvin*, No. 4:14-CV-1414 JAR, 2015 WL 5638059, at *9 (E.D. Mo. Sept. 24, 2015) (citing 20 C.F.R. § 416.927(c)(5)).  *See also Thomas v. Barnhart*, 130 F. App'x 62, 64 (8th Cir. 2005) (ALJ's rejection of physician's opinion upheld in part because of physician's lack of expertise in relevant field).

Whether the ALJ improperly considered counsel's involvement in securing Davenport's opinion in this matter is inconsequential given that the ALJ properly disregarded this opinion evidence for the reasons stated above.

B.    Fibromyalgia and RFC

In *Brosnahan v. Barnhart*, 336 F.3d 671 (8th Cir. 2003), the Eighth Circuit

---

[4] These factors are set out at 20 C.F.R. § 416.927(c).

recognized that fibromyalgia is a chronic condition involving inflammation of the fibrous and connective tissue, "causing long-term but variable levels of muscle and joint pain, stiffness, and fatigue." *Id.* at 672 n.1. Diagnosis of fibromyalgia is "usually made after eliminating other conditions, as there are no confirming diagnostic tests." *Id.* Consistent trigger-point findings and consistent complaints during frequent physicians' visits of variable and unpredictable pain, stiffness, fatigue, and ability to function provide evidence of fibromyalgia, which can be disabling. *Id.* at 678.

Evidence before the ALJ here showed that Earnest began complaining of hip and shoulder pain in October 2008 and was first prescribed pain medication at that time. She thereafter regularly complained to her healthcare providers that she experienced increasingly widespread muscle and joint pain, and she was continually prescribed pain medication. In December 2009, her treating physician first suspected fibromyalgia and began treating her as though she had the condition. Earnest's first affirmative diagnosis of fibromyalgia came in July 2011. Earnest continued in this diagnosis throughout the remainder of her recorded treatment, and her treatment regimen consisted of increasing dosages and strengths of pain medication and muscle relaxants, with little relief. From October 2008 to March 2015, Earnest saw, at a minimum, seven different health care providers – including treating physicians and specialists – on no less than twenty-five separate

occasions for her complaints of widespread chronic pain, including in her hips, shoulders, legs, and low back.[5]

Despite this extensive evidence of consistent complaints, diagnoses, and ineffective treatment from numerous providers over the course of seven years, the ALJ addressed only Earnest's first visit to the Hannibal Free Clinic in January 2009, noted by the ALJ to show a normal exam; the consultative physical examination conducted in June 2013, noted by the ALJ to reveal no limitations; and Earnest's one visit with FNP Davenport in October 2014, summarized by the ALJ to show multiple trigger points, tenderness to touch, and limitation in lumbar motion. Although the ALJ did not err when he disregarded FNP Davenport's March 2015 MMSS, he nevertheless failed to address and/or acknowledge the extensive treatment provided to Earnest for her fibromyalgia and associated chronic pain throughout her seven-year treatment history. An ALJ cannot merely "pick and [choose] only evidence in the record buttressing his conclusion," *Taylor o/b/o McKinnies v. Barnhart*, 333 F. Supp. 2d 846, 856 (8th Cir. 2004), and it is not within the province of this Court to speculate as to whether or why the ALJ may have rejected certain evidence. *Jones v. Chater*, 65 F.3d 102, 104 (8th Cir. 1995). While the ALJ may have considered and for valid reasons rejected this evidence, I am unable to determine whether any such rejection is based on

---

[5] Thirteen of these visits came after her alleged onset date of March 12, 2013.

substantial evidence given the ALJ's wholesale failure to address it. *Id.*

I also note that most of Earnest's treatment for fibromyalgia and chronic pain came from the Hannibal Free Clinic, but that the ALJ addressed only her first visit at the Clinic in January 2009 – over four years prior to Earnest's alleged onset date. The ALJ's decision is silent as to Earnest's numerous visits to the Clinic during the relevant period for chronic pain management, as well as her long term use of powerful pain medication prescribed and managed by the Clinic. The ALJ may not simply ignore relevant evidence. *Reeder v. Apfel*, 214 F.3d 984, 988 (8th Cir. 2000). If the ALJ believed that the Clinic providers' treatment notes could not assist him in determining disability, given Earnest's extensive treatment history, he was obligated to contact them for additional evidence or clarification, and for an assessment of how Earnest's impairments limit her ability to engage in work-related activities. *O'Donnell v. Barnhart*, 318 F.3d 811, 818 (8th Cir. 2003). *See also Bowman v. Barnhart*, 310 F.3d 1080, 1085 (8th Cir. 2002) (where treatment notes fail to detail a claimant's functional abilities, ALJ had obligation to contact treating physician to obtain assessment of how claimant's impairments affect ability to engage in work-related activities); *Vaughn v. Heckler*, 741 F.2d 177, 179 (8th Cir. 1984) (if treating physician has not issued an opinion which can be adequately related to the disability standard, ALJ is obligated to address precise inquiry to physician in order to clarify record).

Despite the extensive and long term treatment history of Earnest's fibromyalgia and chronic pain, as evidenced by numerous records from treating healthcare providers, the ALJ failed to address this relevant evidence in his decision and instead relied on only the opinion of a non-treating consulting physician to find Earnest to have the physical RFC to perform work-related activities. The ALJ made no inquiry of any of Earnest's treating providers regarding her ability to function in the workplace. Because the ALJ failed to consider all of the relevant evidence in making his determination that Earnest's medically determinable impairments, including fibromyalgia, did not rise to the level of disability, I cannot say that the Commissioner's decision is supported by substantial evidence on the record as a whole.

I will therefore remand this matter to the Commissioner for further proceedings. Upon remand, the ALJ is encouraged to contact Earnest's treating sources for functional assessments as to how her impairments affect her ability to engage in specific work-related activities. *Bowman*, 310 F.3d at 1085. Upon receipt of such evidence, the ALJ shall reconsider the record as a whole, including the medical and non-medical evidence of record as well as Earnest's own description of her symptoms and limitations, and reassess her RFC. This reassessed RFC shall be based on some medical evidence in the record and shall be accompanied by a discussion and description of how the evidence supports each

RFC conclusion. *Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007); SSR 96-8p, 1996 WL 374184, at *7 (July 2, 1996).

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **REVERSED**, and this case is **REMANDED** for further proceedings consistent with this opinion.

A separate Judgment in accordance with this Memorandum and Order is entered this same date.


_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 12th day of June, 2017.